**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CARITAS MEDICAL CENTER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-01889 (RMU) |
| ) | |
| MICHAEL O. LEAVITT, Secretary, ) | |
| United States Department of Health and ) | |
| Human Services, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| BAPTIST MEMORIAL HOSPITAL- ) | |
| MISSISSIPPI COUNTY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-02197 (RMU) |
| ) | |
| MICHAEL O. LEAVITT, Secretary, ) | |
| United States Department of Health and ) | |
| Human Services, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| CHIPPEWA VALLEY HOSPITAL & ) | |
| OAKVIEW CARE CENTER, INC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-2329 (RMU) |
| ) | |
| MICHAEL O. LEAVITT, Secretary, ) | |
| United  States Department of Health ) | |
| and Human Services, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

STATUTORY BACKGROUND ........................................................................ 4

PROCEDURAL HISTORY .............................................................................. 16

STANDARD OF REVIEW .............................................................................. 17

ARGUMENT.................................................................................................... 19

    I.      Deference Must Be Accorded to the Secretary's Resolution of a
          Statutory Gap ...................................................................................... 20

          A.    Congress Implicitly Left a Gap in Payment Methodologies
               for the Agency to Fill ............................................................... 20

          B.    Congress Did Not Intend to Retire Old Payment Methods
               Before the New PPS Was Implemented .................................. 22

          C.    There Is No Basis to Conclude That Congress Intended to
               Reinstate the Reasonable Costs Methodology for These Services .......... 24

    II.     Continuation of Existing Payment Methods Was Eminently Reasonable ........... 28

          A.    The Secretary's Construction Hewed Most Closely to
               the Statute and its Purpose....................................................... 29

          B.    The Secretary Had No Obligation to Treat Different Services
               Similarly ................................................................................... 31

    III.    Continued Application of the Existing Payment Scheme Was Not
          Impermissibly Retroactive ................................................................. 32

    IV.   This Court Lacks Jurisdiction Over Claims Not Properly Appealed
          to the PRRB ...................................................................................... 35

CONCLUSION................................................................................................36

## TABLE OF AUTHORITIES

**Cases:**

Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,
  429 F.3d 1136 (D.C. Cir. 2005) ..................................................................31

Air Line Pilots Ass'n v. Quesada,
  276 F.2d 892 (2d Cir. 1960) .................................................................... 32

Alabama Power Co. v. Costle,
  636 F.2d 323 (D.C. Cir. 1979) ..............................................................23

Am. Chiropractic Ass'n v. Leavitt,
  431 F.3d 812 (D.C. Cir. 2005) ..............................................................36

Appalachian Power Co. v. Env't Protection Agency,
  249 F.3d 1032 (D.C. Cir. 2001) ...............................................19, 24, 29

Atlantic Mut. Ins. Co. v. Comm'n of Internal Revenue,
  523 U.S. 382 (1998) ..............................................................................18

Ball Mem'l Hosp. v. Leavitt,
  04cv2254, 2006 U.S. Dist. LEXIS 68226 (D.D.C. Sept. 22, 2006) .......5, 26, 31

Barnhart v. Sigmon Coal Co.,
  534 U.S. 438 (2002) ..............................................................................30

Bd. of Regents v. Roth,
  408 U.S. 564 (1972) ..............................................................................33

Bowen v. Georgetown University Hospital,
  488 U.S. 204 (1988) ..........................................................................33, 34

*Chevron, U.S.A., Inc. v. Nat'l Resource Defense Council, Inc.,
  467 U.S. 837 (1984) ..................................................................... passim

Church of the Holy Trinity v. United States,
  143 U.S. 457 (1892) ..........................................................................18-19

Clinton v. City of New York,
  524 U.S. 417 (1998)   ............................................................................24

County of Los Angeles v. Shalala,
  192 F.3d 1005 (D.C. Cir. 1999) .............................................................4, 5

Crandon v. United States,
  494 U.S. 152 (1990) ..............................................................................18

De Jesus v. Perales,
  770 F.2d 316 (2d Cir. 1985) ..................................................................17

Dir. of Revenue v. CoBank ACD,
  531 U.S. 316 (2001) ..............................................................................18

Engine Mfrs. Ass'n, ex rel. Certain of its Members v. U.S. Env'l Protection Agency,
  88 F.3d 1075 (D.C. Cir. 1996) .........................................................19, 30

Good Samaritan Hosp. v. Shalala,
  508 U.S. 402 (1993) ..........................................................................18, 33

*Henry Ford Health Sys. v. Shalala,
  233 F.3d 907 (6th Cir. 2000) ....................................................24, 25, 31, 34

Landgraf v. USI Film Prods.,
    511 U.S. 244 (1994) .................................................................33, 34
Lewis v. United States,
    523 U.S. 155 (1998) .............................................................................24
Long Island Care at Home, Ltd. v. Coke,
    127 S. Ct. 2339 (2007) ........................................................................35
Martin v. Hadix,
    527 U.S. 343 (1999) ...............................................................33, 34, 35
Methodist Hosp. v. Shalala,
    38 F.3d 1225 (D.C. Cir. 1994) .......................................................4, 17
Mova Pharm. Corp. v. Shalala,
    140 F.3d 1060 (D.C. Cir. 1998) ...............................................18, 19, 30
Nat'l Ass'n of Mfrs. v. Department of the Interior,
    134 F.3d 1095 (D.C. Cir. 1998) ..........................................................30
Nat'l Wildlife Fed'n v. EPA,
    286 F.3d 554 (D.C. Cir. 2002) ......................................................27, 31
Nuclear Energy Inst., Inc. v. EPA,
    373 F.3d 1251 (D.C. Cir. 2004) ......................................................... 27
Pauley v. BethEnergy Mines, Inc.,
    501 U.S. 680 (1991) .............................................................................18
*Regions Hosp. v. Shalala,
    522 U.S. 448, 460 (1998) ....................................... 17, 18, 28, 30, 34
St. Barnabas Hosp. v. Thompson,
    139 F. Supp. 2d 540 (S.D.N.Y. 2001) ................................................21
St. Mary of Nazareth Hosp. Ctr. v. Heckler,
    760 F.2d 1311 (D.C. Cir. 1985) ......................................................... 28
St. Mary of Nazareth Hospital Center v. Schweiker,
    718 F.2d 459 (D.C. Cir. 1983) ........................................................... 28
Shalala v. Ill. Council on Long Term Care,
    529 U.S. 1 (2000) ............................................................................ 36
Smiley v. Citibank (S.D.), N.A.,
    517 U.S. 735 (1996) ...........................................................................34
Springdale Mem'l Hosp. Assoc. v. Bowen,
    818 F.2d 1377 (8th Cir. 1987) ...........................................................23
Stephenson v. Shalala,
    87 F.3d 350 (9th Cir. 1996) ..................................................... 5, 9, 10
Sullivan v. Everhart,
    494 U.S. 83 (1990) ........................................................................... 18
Three Lower Counties Cmty. Health Servs. v. U.S. Dept. of Health & Human Servs.,
    517 F. Supp. 2d 431 (D.D.C. 2007) ....................................................36
Tucson Med. Ctr. v. Sullivan,
    947 F.2d 971 (D.C. Cir. 1991) ....................................................... 4, 5

iii

*United Am. Ins. Co. v. Thompson,
    99cv2493, Slip. Op. (Ex. A) (July 31, 2002) .............................................................passim
United States v. Haggar Apparel Co.,
    526 U.S. 380 (1999) .......................................................................................... 18, 22, 29
United States v. Fulton,
    475 U.S. 657 (1986) ......................................................................................................... 25
United States v. Shimer,
    367 U.S. 374 (1961) ......................................................................................................... 28

**Statutes:**
*42 U.S.C. § 1395*l* .............................................................................................................passim
42 U.S.C. § 1395x .............................................................................................................passim
42 U.S.C. § 1395ww ...................................................................................................................5
Omnibus Budget Reconciliation Act of 1986,
    Pub. L. No. 99-509, 100 Stat. 1874 (1986) ...................................................................6, 8
Omnibus Budget Reconciliation Act of 1987,
    Pub. L. No. 100-203, 101 Stat. 1330 (1987) .......................................................................7
Omnibus Budget Reconciliation Act of 1990,
    Pub. L. No. 101-508, 104 Stat. 1388 (1990) .......................................................................8
*Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) ........................passim
Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999,
    Pub. L. No. 106-113, 113 Stat. 1501 (1999) .............................................................13, 26

**Regulatory Provisions:**
42 C.F.R. § 413.5(a) ...............................................................................................................28
42 C.F.R. § 413.118 (1998) ....................................................................................................32
42 C.F.R. § 413.122 (1998) ....................................................................................................32
*42 C.F.R. § 413.118 .......................................................................................................passim
*42 C.F.R. § 413.122 .......................................................................................................passim
42 C.F.R. § 415.202 (1998) ....................................................................................................28
42 C.F.R. § 415.160 (1998) ....................................................................................................28
42 C.F.R. § 416.65. ...................................................................................................................6
42 C.F.R. § 416.120 ..................................................................................................................6
52 Fed. Reg. 36,765 (Oct. 1, 1987) ......................................................................................6, 7
*63 Fed. Reg. 47,552 (Sept. 8, 1998) .......................................................11, 22, 31, 33
*65 Fed. Reg. 18,434 (Apr. 7, 2000) ................................................................................passim
65 Fed. Reg. 40,535 (June 30, 2000) ................................................................................15, 21

**Legislative Materials:**
H.R. Rep. No. 98-25, 98th Cong., 1st Sess. (1983),
    reprinted in 1983 U.S.C.C.A.N. 219, 351 .........................................................................5
H.R. Rep. No. 105-149, 105th Cong., 1st Sess. 1392 (1997) ..........................................10, 20, 30
H.R. Rep. No. 106-436 (Part I), 106th Cong., 1st Sess. (1999) ...............................................9, 13
S. Rep. No. 99-348, 99th Cong., 2d Sess. (1986) ....................................................................7

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

This case presents a challenge to the method by which the Secretary of Health and Human Services ("Secretary" or "HHS") paid hospitals for outpatient surgical, radiology, and other diagnostic procedures furnished between January 1, 1999 and July 31, 2000, under Part B of the Medicare Act. Plaintiffs advance the remarkable proposition that because the statute did not expressly provide a payment method applicable to these outpatient services during this period, the Secretary should have reimbursed providers under a payment method that Congress had jettisoned some ten years earlier. Plaintiffs' claims ignore not only the basic structure and history of the statute at issue, but also the substantial deference accorded to the Secretary's interpretation of the Medicare Act, as well as simple common sense. Because the Secretary's response to the statutory gap in payment methodologies – to continue paying providers under the scheme in place prior to 1999 – was eminently reasonable, plaintiffs' claims must fail.

The gap in statutory payment requirements at issue in this case arose out of Congress' authorization of a new outpatient prospective payment system (PPS), culminating a decades-long transition in the Medicare program from cost-based reimbursement, under which hospitals had little incentive to economize, to more efficient predetermined payments. See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4523, 111 Stat. 251 (1997). Although the Secretary was authorized to designate services for payment under the outpatient PPS beginning on January 1, 1999, urgent concerns about the performance of the computer systems at the turn of the millennium prevented the Secretary from implementing the outpatient PPS until August 1, 2000. Having assumed that the Secretary would implement the outpatient PPS beginning on January 1,

1999, but not having mandated such a result, Congress failed to provide any express direction about how the agency was to pay for outpatient services during the interim period between the expected date for initial implementation and actual implementation 19 months later.  See United American Ins. Co. v. Thompson, 99cv2493, Slip. Op. at 4-5  (July 31, 2002) (Roberts, J.) (attached as Ex. A).

Faced with this unforeseen gap, the agency continued to pay for outpatient services under the existing payment methodologies until the PPS designations took effect.  This meant that some types of outpatient services continued to be paid under the reasonable cost reimbursement formula during this period, whereas outpatient surgical, radiology, and other diagnostic procedures continued to be paid under the blend rate methodology, a hybrid between cost-based and fixed-rate reimbursement that had replaced the reasonable cost formula in the 1980s as the payment mechanism for the services in question.  This approach was not only a reasonable means of filling the gap left by Congress, but was far more faithful to the language and purpose of the Medicare Act than the approach advanced by plaintiffs.  The structure and history of the relevant statutes indicates that Congress implicitly meant the lapse of old payment methodologies to be contingent on adoption of the new outpatient PPS.  The agency effectuated this intent by retaining the outpatient payment methodologies in existence at the end of 1998 until they could be replaced with the outpatient PPS.

Plaintiffs attempt to dispute the reasonableness of this uniform approach by selectively focusing on the Secretary's application of the blend rate, claiming that a conforming amendment in the Balanced Budget Act of 1997 "terminated" the methodology's applicability as of January 1, 1999.  But plaintiffs cannot contest that Congress failed to expressly provide an applicable

payment methodology after that date.  Under the bizarre interpretation advanced by plaintiffs, the agency would lack authority to reimburse plaintiffs at all during the relevant period.

Plaintiffs, of course, do not advocate such a result, though it is the logical extension of their arguments.  Rather, they seek to be paid their full reasonable costs, even though Congress had rejected that payment method for the types of services at issue here.  Plaintiffs' argument is based on the faulty premise that the reasonable cost formula serves as some sort of talismanic default rule throughout the Medicare program.  Far from evincing the kind of "longstanding" preference for cost-based reimbursement that plaintiffs suggest, Congress expressed repeated dissatisfaction with such payments – dissatisfaction that animated adoption of the outpatient PPS in the first place.  Plaintiffs also tellingly fail to acknowledge that Congress decided to "sunset" the reasonable cost formula as of January 1, 1999, in the same manner that it chose to "sunset" the blend rate.  Thus, plaintiffs seek in one breath the very thing they condemn in the next – payment under a methodology that was not mandated for the period at issue.  Plaintiffs also contend that application of the blend rate to this period was impermissibly retroactive.  Here too, their logic argues more persuasively against the remedy they seek than it does against the Secretary's approach.  The Secretary did not *change* reimbursement rules during the period of delay; it is plaintiffs that seek such a retroactive rule.

Because the agency's approach to filling the statutory gap in payment methods was reasonable and, indeed, less disruptive than resorting to an already abandoned payment mechanism for the services at issue, summary judgment must be granted in favor of the Secretary.

## STATUTORY BACKGROUND

Title XVIII of the Social Security Act ("Act"), 42 U.S.C. §§ 1395-1395iii, commonly known as the "Medicare Act," provides for payment to health care providers for furnishing Medicare-covered services to eligible patients. Part A is a mandatory program that pays for hospital inpatient and related services for the elderly and disabled, and Part B is a voluntary program providing supplemental coverage for other kinds of care, including outpatient services. Section 1833 of the Act, 42 U.S.C. § 1395*l*, specifies the amount of payment to be made for services under Part B. The Medicare program is administered on behalf of the Secretary of Health and Human Services by the Centers for Medicare & Medicaid Services ("CMS").[1]

### Medicare's Gradual Move Away from Cost-Based Reimbursement

At its inception in 1965, Medicare reimbursed both inpatient and outpatient care on the basis of the "reasonable costs" of the medical services provided. "Under this regime, providers were reimbursed for the actual costs they incurred, provided that they fell within certain cost limits." Methodist Hosp. v. Shalala, 38 F.3d 1225, 1227 (D.C. Cir. 1994). As a consequence, the "more [hospitals] spent, the more they were reimbursed," providing "little incentive for hospitals to keep costs down." Tucson Med. Ctr. v. Sullivan, 947 F.2d 971, 974 (D.C. Cir. 1991). Dissatisfied with this state of affairs and eager to "stem the program's escalating costs and perceived inefficiency," County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999), Congress embarked on a transition away from cost-based reimbursement and toward fixed rates.

The first major step in this effort came in 1983 with the creation of a "Prospective

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA").

Payment System" (PPS) for inpatient services. "'Prospective payment' is Medicare jargon for a schedule of set reimbursement amounts corresponding to specific services and procedures." Stephenson v. Shalala, 87 F.3d 350, 353 n.6 (9th Cir. 1996); see also 42 U.S.C. § 1395ww. Under the inpatient PPS, a hospital's payment came to be determined by the condition being treated rather than the treatment costs incurred. See Tucson Med. Ctr., 947 F.2d at 975. By severing the direct link between actual costs and Medicare payments, Congress sought "to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective [sic] hospital practices." County of Los Angeles, 192 F.3d at 1022, quoting H.R. Rep. No. 98-25, 98th Cong., 1st Sess. 132 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 351. These economies were in turn expected to slow the rate of growth in Medicare expenditures. H.R. Rep. No. 98-25 at 132.

At the time the inpatient PPS took effect in 1983, outpatient services continued to be reimbursed on a cost basis, permitting more generous payment for these services.[2] See Ball Mem'l Hosp. v. Leavitt, 04cv2254, 2006 U.S. Dist. LEXIS 68226, at *10 (D.D.C. Sept. 22, 2006) (Collyer, J.). Unsurprisingly, "services that were traditionally performed in the hospital [on an inpatient basis] were increasingly delivered as outpatient care, for which reimbursement was not so limited." Id. In light of this trend, Congress began exploring options for curbing outpatient costs. Id.

---

[2] Section 1833(a)(2)(B) provides that Medicare will pay for the lesser of a provider's reasonable costs or customary charges, 42 U.S.C. § 1395*l*(a)(2)(B), but since hospitals almost uniformly charge patients more than the actual cost of providing services, hospitals are generally paid their reasonable costs under this scheme. See Stephenson, 87 F.3d at 352. The total reimbursement is also reduced by the amount the hospital receives in coinsurance from the beneficiary. 42 U.S.C. § 1395*l*(a)(2)(B).

**Congress Replaces Exclusively Cost-Based Reimbursement with a Blended Payment Rate for Certain Categories of Outpatient Services**

With the passage of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874 (1986) ("OBRA 1986"), Medicare ceased paying for ambulatory surgical procedures exclusively based on reasonable costs.  Id. § 9343(a), codified as amended at 42 U.S.C. §§ 1395*l*(a)(4), (i)(3).  Instead, Congress provided that hospitals were to be paid for the lesser of their reasonable costs or the so-called "blended payment amount," a hybrid formula that contains both a cost-component and a fixed rate-component.[3]  Id.  Under this formula, a hospital's payment is based in part on the costs it incurs in performing outpatient surgery and in part on prospectively determined rates that are independent of those costs.  The fixed rate portion, also referred to as the "ASC payment amount," is equal to the standard rate that would be paid to a free-standing ambulatory surgical center (ASC) for the same service in the same geographic area, less beneficiary deductibles.[4]  42 U.S.C. § 1395*l*(i)(3)(B)(i)(II); 42 C.F.R. § 413.118.  Initially, the blended payment amount was derived from 75% of a hospital's costs and 25% of the fixed ASC payment amount.  42 U.S.C. § 1395*l*(i)(3)(B)(ii).  Over the years, Congress increased the fixed rate proportion in relation to the cost proportion so that hospitals' reimbursement for outpatient surgical procedures depended less and less on the costs incurred.  Id.  By 1991, the costs incurred by hospitals for ambulatory surgical procedures accounted for

_____

[3] Hereinafter, this calculation of the lesser of reasonable costs or blended payment amount is referred to as the "blend rate methodology."

[4] Pursuant to § 1833(i), the Secretary has designated certain surgical procedures which, though commonly performed in hospitals, can safely be performed in ASCs.  42 U.S.C. § 1395*l*(i)(1)(A); 42 C.F.R. § 416.65.  These stand-alone entities typically have lower fixed costs than hospitals .  See 52 Fed. Reg. 36,765, 36,772 (Oct. 1, 1987).  ASCs are paid accordingly to fully-prospective rates.  42 C.F.R. § 416.120(c).

6

only 42% of the total blended payment amount.  Id.

Effective October 1, 1988, a similar blend rate methodology replaced the reasonable cost formula as the payment methodology for radiology and other diagnostic services designated by the Secretary.  See Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 § 4066, 101 Stat. 1330 (1987), codified as amended at 42 U.S.C. §§ 1395*l*(a)(2)(E), (n)(1); see also 42 C.F.R. § 413.122.  The blended payment amount for these services is a hybrid between a hospital's reasonable costs and the predetermined amount that would be paid for the same service if it had been performed in a physician's office.  42 U.S.C. § 1395*l*(n)(1)(B).  The portion of the total blended payment amount attributable to reasonable costs decreased over the course of several years in relation to portion attributable to the fixed rate.  See 42 C.F.R. § 413.122(b)(2).

Although § 1833(a)(2)(B), which provides for payment on the basis of reasonable costs, remained the statutory basis for reimbursing certain other types of outpatient services, the inclusion of a fixed rate component in the payment scheme for outpatient surgery, radiology, and other diagnostic procedures marked an intermediate step toward full implementation of an outpatient PPS.  See S. Rep. No. 99-348, 99th Cong., 2d Sess. at 143 (1986) (provision was designed to "extend the . . . prospective payment approach to hospital outpatient department surgery").  As with the inpatient PPS, payment of the blended amount gave hospitals an incentive to minimize their costs, 52 Fed. Reg. 36,765, 36,770 (Oct. 1, 1987), although this incentive was limited by the fact that hospitals could still recover a certain portion of any additional costs they might incur.  In the final rule implementing the blend rate for outpatient surgical procedures, the Secretary  put hospitals on notice that the partially-prospective blend rate was only a "temporary payment methodology that is to be used by hospitals until a prospective payment system for

ambulatory surgical procedures performed in hospitals is developed." Id. at 36,767.

**Congress Explores More Ways to Curb the Growth of Medicare Expenditures for Outpatient Services**

Congress twice directed the Secretary to investigate the feasibility of a full-scale prospective payment system for outpatient services and to report back to Congress. The initial directive was contained in the same section of the OBRA 1986 that introduced the blend rate methodology for outpatient surgery. Pub. L. No. 99-509 § 9343(f). Then, in 1990, Congress directed the Secretary to begin modeling an outpatient PPS. See Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4151(b)(2), 104 Stat. 1388, 1388-72 (1990) ("OBRA 1990"). As with the inpatient scheme, the object of an outpatient PPS was to set "appropriate limits on increases in expenditures under the medicare program" and to give hospitals "incentives to control the costs of providing outpatient services." Id. §§ 4151(b)(2)(A)(i), (iii).

In that same enactment, Congress also amended § 1861(v) of the Act by mandating that payments for capital-related costs for outpatient services be reduced by 10 percent[5] and reasonable costs otherwise determined for non-capital related costs be reduced by 5.8 percent. See OBRA 1990 § 4151(b)(1), codified as amended at 42 U.S.C. § 1395x(v)(1)(S)(ii). These provisions (hereinafter "reductions in payment") were due to sunset in 1995, but were extended several additional times. See Pub. L. No. 103-66, § 13522, 107 Stat. 312 (1993); Pub. L. No. 105-33, § 4522, 111 Stat. 251 (1997); Pub. L. No. 106-113, § 201(k), 113 Stat. 1501 (1999). These reductions in payment were to be applied not only to the calculation of payments under the reasonable cost rule in § 1833(a)(2)(B), but also in calculating the cost proportion of the blended

---

[5] For 1991, capital-related costs were to be reduced by 15 percent. Id. § 4151(b).

payment amount in §§ 1833(i)(3) and 1833(n)(1).  See 42 U.S.C. § 1395x(v)(S)(ii)(IV).

**The Balanced Budget Act of 1997**

With the Secretary's full support, Congress authorized the implementation of an

outpatient prospective payment system as one element of the larger Balanced Budget Act of 1997

("BBA"), Pub. L. No. 105-33 (1997), which "contained more than 300 Medicare provisions and

represented the most extensive reforms since enactment of the program in 1965."  H.R. Rep. No.

106-436 (Part I), 106th Cong., 1st Sess. at 32 (1999).  Among other things, the BBA establish

new payment methodologies "affecting virtually every segment of the health care industry. . . ."

Id. at 33.

Section 4523 of the BBA added a new subsection (t) to § 1833 of the Social Security Act

that authorized the Secretary to establish a prospective payment system for services performed in

hospital outpatient departments (OPDs):

> With respect to covered OPD services (as defined in subparagraph (b)) furnished
> during a year beginning with 1999, the amount of payment under this part shall be
> determined under a prospective payment system established by the Secretary in
> accordance with this subsection.

42 U.S.C. § 1395*l*(t)(1)(A).  Subparagraph (b) in turn defines "covered OPD services" as

"hospital outpatient services designated by the Secretary."[6]  42 U.S.C. § 1395*l*(t)(1)(B)(i).

---

[6]In addition to authorizing an outpatient PPS, the BBA also amended the blend rate
formula to correct a problem known as "formula driven overpayment," whereby hospitals were
able to increase their Medicare payments by overcharging beneficiaries.  See generally
Stephenson, 87 F.3d 350.  Section 4521 of the BBA corrected this problem by offsetting
payments by the amount contributed by beneficiaries.  This change became effective on a self-
executing basis on January 1, 1997.  See BBA § 4523.  The BBA also extended the applicability
of the reduction in payment provisions, 42 U.S.C. §§ 1395x(v)(1)(S)(ii)(I), (II), until January 1,
2000.  BBA § 4522, the same date on which services provided by cancer hospitals were first
permitted to be designated for payment under the outpatient PPS.  See BBA § 4523(t)(8),
codified at 42 U.S.C. § 1395*l*(t)(11)(a).

Congress included several "conforming amendments" in the same section of the BBA that authorized outpatient PPS. These amendments to § 1833 of the Act added a January 1, 1999, "sunset" date to *both* the blend rate provisions and the reasonable cost formula at 42 U.S.C. § 1395*l*(a)(2)(B). See BBA § 4523(d). As amended, § 1833 provided that reimbursement for outpatient services would be calculated under the existing payment methods until January 1, 1999, and thereafter would be determined under the new subsection (t) dealing with outpatient PPS.[7] Subsection (t), in turn, provided for payment under the new PPS only for "hospital outpatient services designated by the Secretary." 42 U.S.C. § 1395*l*(t)(1)(B)(I). The BBA contained no express direction on how the agency was to reimburse outpatient services if they were furnished after January 1, 1999, but had not yet been designated by the Secretary for payment under the new PPS in subsection (t).

Like other prospective payment reforms in the Balanced Budget Act, the new outpatient PPS was "aimed at reducing the rate of growth of Medicare spending for outpatient services." H.R. Rep. No. 105-149, 105th Cong., 1st Sess. 1392 (Part II) (1997) (statement of Congressional Budget Office). On balance, the new PPS provisions were expected to save the federal government $7.2 billion in the first five years. Id.

In light of the savings predicted to result from implementation of PPS, together with the fact that the Secretary herself had proposed the move, Congress had reason to expect that the Secretary would implement the new payment system as quickly as possible. From the

---

[7] Specifically, § 1833(a)(4), as amended, provides for payment for ambulatory surgical services as determined under subsection (i)(3) "or subsection (t)" of § 1833; similarly, § 1833(a)(2)(E), as amended, provides for payment for radiology and other diagnostic procedures as determined under subsection (n) of § 1833 or, "for services or procedures performed on or after January 1, 1999, subsection (t)." See 42 U.S.C. §§ 1395*l*(a)(2)(E), (a)(4).

conforming amendments, it appears that Congress anticipated that outpatient PPS would replace

the old payment methods on January 1, 1999, the first date for which it was authorized.

Subsequent to the passage of the BBA, however, the agency encountered a critical stumbling

block to the swift implementation of PPS – the so-called "Year 2000" or "Y2K" computer crisis.

### Y2K Computer Crisis Delays Implementation of Outpatient PPS and Creates Gap in Payment Methodologies

In the months and years leading up to January 2000, the agency faced the specter of a

total systems failure if it did not act quickly to correct a programming defect which prevented

computer systems from distinguishing between the years 1900 and 2000.  This computer crisis

was not unique to Medicare, but Medicare was uniquely vulnerable due to its near-total reliance

on electronic claims processing.  63 Fed. Reg. 47,552, 47,605 (Sept. 8, 1998).  At the same time,

implementation of the new outpatient PPS required "massive" changes to the computer systems

that process hospital payments, including expansion of claims records, conversion of claims

histories to correspond to the new format, and extensive rewriting of programs.  Id.

Because implementation of outpatient PPS would "divert resources from the Y2K

project," creating a "real danger that basic [Medicare] enrollment and claims processing activities

[would] be disrupted," id. at 47,605, the Secretary reluctantly concluded that there was "no

alternative to a delay in implementation" of the outpatient PPS until after the new millennium.

Id. at 47,606.  The Secretary published the proposed rule implementing the BBA on September 8,

1998, notifying the public of the anticipated delay in PPS implementation.  Id. at 47,605-06.   In

discussing the Secretary's expectation that the delay would not prejudice hospitals in the

aggregate, the proposed rule indicated that during the interim period hospitals would continue to

11

receive payments under the "existing payment system."  Id. at 47,606.  The Secretary noted that hospitals were expected to receive 3.8% more in total payments during this interim period as a result of being reimbursed under the pre-existing system rather than the new PPS.  Id.

**Congress Approves HHS's Delay in Change to Outpatient Payment Systems**

Because § 1833(t) of the BBA did not make implementation of the outpatient PPS self-executing on January 1, 1999, but instead triggered the new system on that date only for those "covered OPD services" which the Secretary had designated, see 42 U.S.C. §§ 1395*l*(t)(1)(A), (B), the Secretary took the position that no legislative action was needed in order to postpone implementation until after the Y2K crisis has been averted.  The Secretary nevertheless advised Congress that the Y2K dilemma would "delay[] changes in how providers are paid that were enacted in the Balanced Budget Act," including implementation of the outpatient PPS.  See  The Year 2000 Computer Problem: Will the Health Care Industry Be Ready? : Hearing Before Senate Special Committee on the Year 2000 Technology Problem, ("Y2K Hearings"), 105th Cong., 2d Sess. 71 (1998) (responses of HCFA Director Nancy-Ann Min deParle).  "Congress agreed that the Y2K problem was a top priority and encouraged the Secretary to devote sufficient personnel resources to the issue."  Universal Am. Ins. v. Thompson, Slip Op. at 2 (Ex. A).

The propriety of postponement of the outpatient PPS was subsequently ratified by Congress in amendments to § 1833(t) passed in November 1999 as part of the Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999 ("BBRA"), Pub. L. No. 106-113, 113 Stat. 1501 (1999).  In the BBRA, Congress added three new subsections to § 1833(t),[8] which

_____

[8] These amendments are not substantively relevant to the issues in this lawsuit.  Section 201 of the BBRA permits the Secretary to make additional adjustment to PPS payments for certain "high cost or "outlier" services.  Section 202 establishes a "transitional corridor" that

became "effective as if included in the enactment of the BBA." Id. §§ 201(m), 202(b), 204(c).
This language was taken from the House version of the legislation, H.R. Rep. No. 106-436 (Part
I) at 14, 16, and was intended to mean that the changes would take effect "[u]pon implementation
of the hospital outpatient prospective payment system," id. at 52, 55, 56, rather than taking effect
retroactively on January 1, 1999. This wording was chosen by Congress with the conscious
knowledge that implementation of outpatient PPS had been delayed beyond the January 1, 1999
authorization date.

Congress also extended the 5.8 and 10 percent reduction in payments in § 1861(v) "until
the first date that the prospective payment system under section 1833(t) is implemented." BBRA
§ 201(k), codified at 42 U.S.C. §§ 1395x(v)(1)(S)(ii)(I), (II). Having been notified that the
agency would delay changes to various payment methods, Congress took no steps to mandate any
particular payment method(s) for outpatient services furnished after January 1, 1999 but before
implementation of the PPS. Congress did not expressly extend the January 1, 1999 "sunset"
dates for *either* the blend rate provisions or the reasonable cost rule at 42 U.S.C. §
1395*l*(a)(2)(B).

**Final Rule Implements Outpatient PPS Prospectively**

Meanwhile, the agency received approximately 10,500 comments during the 11-month
comment period for its proposed rule implementing the BBA. See 65 Fed. Reg. 18,434, 18,438
(Apr. 7, 2000). Nine comments, including one from the American Hospital Association, see

---

increases Medicare payments during a three-year phase-in period. And Section 204 caps co-
payments at the dollar amount of the deductible for an inpatient hospital stay under Part A and
provides Medicare payments to make up the difference between the frozen co-payment amount
and the new limit.

Rulemaking Record ("R.R.") at 758-60, urged that the Secretary pay outpatient surgery,

radiology, and other diagnostic procedures according to the reasonable cost formula, contending

that Congress had intended to terminate the Secretary's authority to use the blend rate

methodology after December 31, 1998.[9]  By and large, these commenters did not question the

authority of or need for the Secretary to delay implementation of outpatient PPS, however.  See,

e.g., R.R. at 804, 835, 865.  The American Hospital Association went so far as to caution the

Secretary that "the outpatient PPS should not be implemented until all systems are ready."  R.R.

at 748; see also R.R. at 856 (Mem'l Health and Univ. Med. Ctr. cautioning against

implementation of PPS "simply to attain an arbitrary deadline").  None of the commenters

suggested that it was inappropriate for HHS to draw a distinction between ambulatory surgical,

radiology, and diagnostic services, on the one hand, and other categories of services on the other.

Defendants' Statement of Additional Material Facts Not in Dispute (Defs. Statement of Facts) ¶

6.  Nor did any comments contend that continued application of the blend rate violated the

prohibition on cross-subsidization or was otherwise unreasonable.  Id. ¶ 6.

The Secretary promulgated final regulations implementing the prospective payment

system for outpatient department services on April 7, 2000.  65 Fed. Reg. 18,434.  The Secretary

designated all but a handful of outpatient services as "covered OPD services" payable under the

new outpatient PPS, id. at 18,441-44, which was to take effect prospectively on July 1, 2000, id.

at 18,434.  This effective date was subsequently postponed to August 1, 2000, to account for last-

minute computer programming delays.  See 65 Fed. Reg. 40,535 (June 30, 2000).  Although no

---

[9] See R.R. at pp. 803-05 (Missouri Hosp. Assoc.), 819-820 (Michigan Health and Hosp.
Assoc.), 832-33(Illinois Hosp. & HealthSystems Assoc.), 835 (Hosp. & Healthsystem Assoc. of
Pennsylvania), 844-45 (Am. Assoc. of Eye & Ear Hosps.), 865-66 (Mem'l Health and Univ.
Med. Ctr.), 879 (Detroit Med. Ctr.), 902 (Mercy Health Servs.).

commenters recommended that the agency apply the PPS retroactively to services furnished on or

after January 1, 1999, the Secretary discussed why she rejected that approach.  65 Fed. Reg. at

18,489  She concluded, among other things, that the payment information necessary to

implement the PPS retroactively was not readily available in automated form and that the

administrative burden of reprocessing some 160 million claims by hands made this approach

impracticable.  Id.

The Secretary also concluded that, as a matter of law, the BBA did  not "require

retroactive application of PPS."  Id. at 18,489.  The Secretary noted that although Congress "may

have presumed" that CMS would "be able to designate covered outpatient services and

implement the outpatient PPS by January 1, 1999," id. at 18,490, it did not "set a deadline" for its

implementation.  Id. at 18,489.  Consequently, § 4523 of the BBA could reasonably by read to

"require implementation of PPS for services furnished in a year beginning in 1999 if HCFA has

designated in its implementing regulations those services as covered services for purposes of

PPS."  Id. at 18,489 (emphasis in original); see generally United American, (Ex. A) ("The

Secretary permissibly interpreted the statute as not requiring retroactive PPS payments for OPD

services furnished between January 1, 1999 and August 1, 2000.").

The Secretary acknowledged that it was "possible to read the statute in such a way that an

outpatient service furnished after January 1, 1999 but not yet designated as a covered outpatient

service by HCFA for purposes of PPS would have no payment methodology applicable to it."  65

Fed. Reg. at 18,489-90.  The agency concluded, however, that Congress could not have "intended

such a result."  Id. at 18,490.  Accordingly, the Secretary declined to read the January 1, 1999,

"sunset" dates in the conforming amendments as terminating the agency's authority to make

15

payments for outpatient services after that date, regardless of the status of outpatient PPS.

Instead, the Secretary determined that, given the statute's ambiguous language coupled with the

unforeseen delays arising from the Y2K problem, the statute implicitly "authorizes the Secretary

to continue to pay for the service[s] under the existing methodolog[ies] until PPS can be

implemented." Id. at 18,490.

## PROCEDURAL HISTORY

In these three consolidated actions, plaintiff hospitals challenge the Secretary's decision

to pay for outpatient surgical, radiology, and other diagnostic procedures on the basis of the blend

rates that had been applicable to those services since the late 1980s.  These actions do not involve

payment for other categories of services.  Def. Statement of Facts ¶ 8.

The fiscal intermediaries which reviewed the cost reports submitted by the plaintiff

hospitals during the relevant period determined that they were obligated to pay plaintiffs for these

services under 42 C.F.R. §§ 413.188 and 413.122, the regulations setting forth the blend rates.

Plaintiffs appealed to the Provider Reimbursement Review Board (PRRB) for cost reporting

periods overlapping with the period for which there was a gap in mandated payment methods –

January 1, 1999 through July 31, 2000.  Not every hospital appealed the payment amounts for

every relevant cost period, however.  See, e.g., Caritas Appeals Record (A.R.) at 5, line 19

(Oakes appealing only payment for fiscal year 7/1/99 to 6/30/00).

The PRRB granted expedited judicial review to three separate groups of plaintiffs on the

ground that it was without authority to decide the legal question raised by the hospitals: "whether

the regulations, 42 C.F.R. § 413.118 and 413.122, are valid."[10]  Caritas A.R. at 1; Chippewa

_____

[10] One plaintiff, Clallam County Public Hospital District (Olympic Memorial Hospital),
failed to perfect a timely appeal and the PRRB concluded that it lacked jurisdiction over

16

Valley A.R. at 4; Baptist Memorial A.R. at 2.  Three separate actions were filed, and they were

subsequently consolidated for the purpose of briefing on cross-motions for summary judgment.

## STANDARD OF REVIEW

The Secretary's interpretation of a statute committed to his administration is entitled to

deference so long as it is a "permissible" construction that is not precluded by an unambiguous

statutory command to the contrary.  Regions Hosp. v. Shalala, 522 U.S. 448, 460 (1998)

(deferring to HHS rule under Medicare Act).  The "tremendous complexity" of the Medicare Act

"adds to the deference which is due to the Secretary's decision."  Methodist Hosp., 38 F.3d at

1229.  "In endeavoring to penetrate this maze, courts must guard themselves against the

temptation of allowing a literal reading of a relatively recent amendment to set at naught the

experience of administrators acquired over a score of years."  De Jesus v. Perales, 770 F.2d 316,

321 (2d Cir. 1985).

Review of the Secretary's interpretation begins with the familiar inquiry into whether "the

intent of Congress is clear" as to the "precise question at issue."  Chevron, U.S.A., Inc. v. Nat'l

Resource Defense Council, Inc., 467 U.S. 837, 842 (1984).  If, by "employing traditional tools of

statutory construction," Congress' intent is clear, "that is the end of the matter."  Id.  Where a

statute is instead silent or ambiguous with respect to a particular issue, courts presume that

Congress implicitly or explicitly "left a gap for the agency to fill."  Chevron, 467 U.S. at 843.  "If

the agency's reading fills [this] gap or defines a term in a reasonable way in light of the

Legislature's design, [a court will] give that reading controlling weight, even if it is not the

answer 'the court would have reached if the question initially had arisen in a judicial

---

Olympic's claims.  See Chippewa A.R. at 1-10.  It was therefore not granted expedited judicial
review by the PRRB.  Id.

proceeding.'" Regions Hosp., 522 U.S. at 457, quoting Chevron, 467 U.S. at 843, n.11.

It is not difficult for an agency to establish that its construction of an ambiguous statute "reflects a reasonable interpretation of the law." Id. at 464.  Courts are "especially reluctant" to reject an agency view when it "fits 'the design of the statute as a whole and . . . its object and policy." Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417-18 (1993), quoting Crandon v. United States, 494 U.S. 152, 158 (1990).  The agency need not establish that its construction is the only one that the statute will bear, Regions Hosp., 522 U.S. at 460, or even that it is "the best interpretation of the statute," United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999), quoting Atlantic Mut. Ins. Co. v. Comm'n of Internal Revenue, 523 U.S. 382, 389 (1998), or the "most natural one by grammatical or other standards,"  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991).  Rather, plaintiffs bear the difficult burden of showing that the interpretation they advance is "the only possible interpretation" of the statute.  Regions Hosp., 522 U.S. at 460, quoting Sullivan v. Everhart, 494 U.S. 83, 89 (1990).

There are times when even "seemingly clear" language must yield to an agency's construction in conflict with it, because "a literal reading of a statute would thwart the purposes of Congress." Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998); see also Church of the Holy Trinity v. United States, 143 U.S. 457, 459-60 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity.").  Such is the case both when "as a matter of historical fact, Congress did not mean what it appears to have said" and when "as a matter of logic and statutory structure, it almost surely could not have meant it."  Engine Mfrs. Ass'n, ex rel. Certain of its Members v. U.S. Env'l Protection Agency, 88 F.3d 1075, 1089 (D.C. Cir. 1996).  "[W]hen 'there are multiple ways of

18

avoiding a statutory anomaly, all equally consistent with the intentions of the statute's drafters (and equally inconsistent with the statute's text),' [courts] accord standard <u>Chevron</u> step two deference to an agency's choice between such alternatives." <u>Appalachian Power Co. v. Env't Protection Agency</u>, 249 F.3d 1032, 1044, n.3 (D.C. Cir. 2001), <u>quoting</u> <u>Mova</u>, 140 F.3d at 1068.

## ARGUMENT

Despite the complexity of some of the statutory provisions involved, this case can be resolved on the basis of a few simple premises. First, the statute is silent as to the payment method applicable during the period at issue (i.e. during the 19 months between when Congress anticipated initial implementation of outpatient PPS and when, due to the Y2K emergency and other technical issues, it actually was implemented). <u>See</u> <u>United American</u>, Slip Op. at 4-5 (Ex. A). This silence necessitates substantial deference to the agency's choice between not paying at all (which was rejected for obvious reasons) and adopting another logical payment method among remaining alternatives. And whatever other conclusions might be drawn, Congress certainly did not mandate the use of the reasonable cost formula for the services at issue during the relevant time period. To the contrary, that payment method had been abandoned by Congress with regard to outpatient surgery, radiology, and diagnostic procedures many years before, and Congress since 1986 has consistently moved toward payment of outpatient services under predetermined rates. Given the choice between continuing the use of existing methodologies until the PPS could take their place, or reinstating a long-abandoned methodology that would undermine the purpose of the BBA, the agency made not just a reasonable decision, but the decision most faithful to the language and purpose of the statute.

19

**I.    Deference Must Be Accorded to the Secretary's Resolution of a Statutory Gap**

**A.    Congress Implicitly Left a Gap in Payment Methodologies for the Agency to Fill**

As Judge Roberts of this Court has already recognized, "Congress did not express unambiguously its intent regarding how payments under the PPS would be handled where the services were provided after January 1, 1999, but before the services were designated by the Secretary as 'covered services' for purposes of the PPS." United American, Slip Op. at 5.  In United American, an insurance company sought to compel the Secretary to apply the outpatient PPS retroactively to services furnished on or after January 1, 1999.  The district court rejected this effort, concluding that the statute was silent as to the applicable payment method during the period at issue.  Id. at 7.  The policy choice of which method to use to fill this gap is the quintessential type of decision left to the agency's discretion.  See Chevron, 467 U.S. at 843.

Congress appears to have anticipated, when it passed the Balanced Budget Act in 1997, that the agency would designate services for payment under the outpatient PPS in subsection (t) of § 1833 effective January 1, 1999 –  the same day it was first authorized to do so.  The substantial cost-savings predicted from PPS implementation in the first five years following passage of the BBA also appear to be predicated on this assumption.  See H.R. Rep. No. 105-149, at 1392.   Under this assumption, Congress provided that payment would be made under the existing payment methodologies – both the reasonable costs formula and the blend rates –  until January 1, 1999, at which time payment would then be determined under subsection (t), the new PPS provision.[11]  See Pub. L. 105-33 § 4523(d), codified at 42 U.S.C. §§ 1395*l*(a)(2)(B),

---

[11] Sections 1395*l*(a)(2)(E) and (a)(4) of title 42 specify only two ways to reimburse the outpatient surgical, radiology, and other diagnostic services in question: under (n)(1) or (i)(3) respectively, for services furnished before January 1, 1999, or under subsection (t), for services

20

(a)(2)(E), (a)(4), (i)(3), (n).

Subsection (t) is not self-executing, however; services are not payable under the outpatient PPS until the Secretary affirmatively designates services for payment under the new system.  See 42 U.S.C. §§ 1395*l*(t)(1)(A), (B); see also United American, Slip Op. at 4-5.  It is uncontested that the Secretary's designations under the PPS did not take effect until August 1, 2000, for reasons discussed previously.  65 Fed. Reg. at 40,535.  Thus, although Congress may have drafted the BBA under the assumption that the outpatient PPS would immediately replace the existing payment methodologies on January 1, 1999, the statute did not mandate that result. "Congress did not establish a deadline for the Secretary to designate the 'covered OPD services' which, if furnished on or after January 1, 1999, would be paid under the PPS."  United American, Slip Op. at 4-5.  Instead, Congress provided that, beginning in 1999, any services that had already been so designated would cease being paid under the pre-existing payment system and would immediately be paid under PPS.[12]  Id. at 6.

When it provided that the existing payment system would be replaced by the new

---

furnished thereafter.  Neither of these two mechanisms is applicable to the services at issue in this case, which were indisputably furnished after January 1, 1999 but before they were designated for payment under subsection (t).  See 65 Fed. Reg. 40,535. While Congress mandated that the blend rate be used before January 1, 1999, nowhere did Congress expressly forbid the Secretary from using the same method after that date if outpatient PPS had not yet gone into effect.  There is simply no indication that Congress intended to withdraw the Secretary's authority to pay under the existing system where the statute was otherwise silent as to the appropriate payment method.  Cf. St. Barnabas Hosp. v. Thompson, 139 F. Supp. 2d 540, 543-44 (S.D.N.Y. 2001) (rejecting argument that a "statute mandating a 5.8 percent cut of costs of Part B outpatient services would foreclose the Secretary from making such a cut with respect to Part B inpatient services").

[12] This is in contrast to other parts of the BBA, which established mandatory deadlines by which the Secretary had to complete certain actions.  See, e.g., BBA § 4001 (providing that the "Secretary shall" implement a risk adjustment methodology for Medicare+Choice "no later than January 1, 2000").

subsection (t) at the beginning of 1999, Congress simply did not "anticipate[] the delay caused by the Y2K concerns, and therefore, did not address clearly and unambiguously how payment for services provided during the unanticipated delay would be calculated. . . ." <u>United American</u>, Slip Op. at 7. "Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect." <u>Haggar Apparel</u>, 526 U.S. at 392. For this reason, statutes must be construed in a manner that allows agencies to respond to "unforeseen situations and changing circumstances in a manner consistent with Congress' general intent." <u>Id.</u> at 392-93. It was manifestly the province of the agency to decide "how best to implement" the policies underlying the BBA in a situation "not covered by the statute's specific terms." <u>Id.</u>

**B.    Congress Did Not Intend to Retire Old Payment Methods Before the New PPS Was Implemented**

Plaintiff does not appear to question the agency's authority to delay the implementation of the outpatient PPS in light of the pressing Y2K concerns, a delay which the agency predicted would result in higher payments to hospitals during the interim pre-PPS period than if outpatient PPS has been implemented by January 1, 1999. 63 Fed. Reg. at 47,606. Nor have plaintiffs challenged the Secretary's decision not to apply PPS payments retroactively to services furnished during the period of delay.[13] They instead argue (without any authority) that Congress intended to "terminate" the blend rate irrespective of whether the new PPS was ready to take its place and instead resuscitate the exclusively cost-based system it had criticized and abandoned many years before.

---

[13] Judge Roberts of this Court has already found that the Secretary's decision not to apply the PPS retroactively was reasonable, in light of the absence of any statutory deadline by which PPS designations had to be made, as well as the serious practical difficulties involved in applying a new system retroactively. <u>See</u> <u>United American</u>, Slip Op. at 6, 9 ("[C]alculating retroactive payments would compromise the efficient implementation of the PPS").

22

The structure of the BBA refutes this contention, indicating instead that Congress implicitly conditioned retirement of the old methodologies on their replacement with outpatient PPS.  In contrast to the provision of the BBA which sunset the 5.8% and 10% reductions in payments, Pub. L. 105-33, § 4522, the January 1, 1999 "sunset" dates on which plaintiffs' entire case rests were not included as a separate section to the BBA.  Rather, they were added as "conforming amendments" in § 4523, the section authorizing outpatient PPS beginning on January 1, 1999.  Designation of an amendment as a "technical" or "conforming" amendment is valid evidence that the provision "was not intended to resolve any substantive issues." Alabama Power Co. v. Costle, 636 F.2d 323, 401, n. 49 (D.C. Cir. 1979); see also Springdale Mem'l Hosp. Assoc. v. Bowen, 818 F.2d 1377, 1386 n.9 (8th Cir. 1987) (refusing to accept that Congress rescinded long-standing Medicare appeals requirement "under the cloak of a 'conforming amendment'").  Had Congress intended to reverse the steady trend away from cost-based reimbursement, one would expect it to have done so with a great deal more clarity.  See Dir. of Revenue v. CoBank ACD, 531 U.S. 316, 324 (2001) (inferring that Congress did not intend "conforming amendment" to effect major legislative change).  Congress' silence in this regard is "insufficient to disrupt" longstanding practice.  Id.

Moreover, if plaintiffs are correct that the Secretary lacked implicit authority to fill the gap in payment methodologies left by Congress, then plaintiffs would be entitled to no payment whatsoever.  For, the blend rate provisions that were "terminated" – § 1833(a)(2)(E), (a)(4), (i)(3) and (n) – and § 1833(t), which was not yet implemented, provide the sole statutory basis for reimbursing providers for the relevant surgical, radiology, and other diagnostic services.  See Henry Ford Health Sys. v. Shalala, 233 F.3d 907, 911 (6th Cir. 2000).  The reasonable cost rule

23

under which plaintiffs seek payment specifically excepts these categories of services from its

purview.[14] Id. Under plaintiffs' unyielding interpretation of the statute, the services at issue

would have no payment methodology applicable to them.

Since the unavailability of any payment method for services rendered to Medicare

beneficiaries is an "absurd and unjust result which Congress could not have intended," Clinton v.

City of New York, 524 U.S. 417, 429 (1998) (citation omitted), some departure from this literal

reading of the statute is necessary to avoid "dramatically separat[ing] the statute from its intended

purpose." Lewis v. United States, 523 U.S. 155, 160 (1998); see also Appalachian Power, 249

F.3d at 1041. Plaintiffs are not in a position to dictate which alternative the agency should have

chosen to cure this anomaly. So long as the agency has not unnecessarily rewritten the statute in

the process of curing an obvious anomaly, courts must defer to the agency's reasonable choice

between differing alternatives. Id. at 1044 n.3.

C.     **There Is No Basis to Conclude That Congress Intended to Reinstate the
       Reasonable Costs Methodology for These Services**

Plaintiffs cannot point to any coherent indication that Congress intended to resurrect the

reasonable cost formula for the services at issue, let alone the kind of "clear legislative

command" necessary to foreclose deference to the Secretary's choice. See United States v.

Fulton, 475 U.S. 657, 667 (1986). Plaintiffs' primary argument is, in effect, that Congress must

---

[14] The statute expressly provides that outpatient radiology and other diagnostic procedures
are excepted from the lesser of costs and charges formula found in § 1833(a)(2)(B). See 42
U.S.C. § 1395*l*(a)(2)(B) (excluding from its coverage "those [services] described in
subparagraph[] . . . (E)," the subparagraph dealing with radiology and other diagnostic
procedures). Because payment for ambulatory surgical procedures is provided separately in
(a)(4) using similar language as the above-referenced subparagraph (E) and enacted for a similar
purpose, these services are likewise excluded from the purview of (a)(2)(B). See Henry Ford,
233 F.3d at 910-11.

have intended the agency to revert to the reasonable cost formula because it terminated

application of the blended payment method as of January 1, 1999.  This argument refutes itself.

For, under plaintiffs' logic, Congress also must have terminated the Secretary's authority to pay

reasonable costs when it amended § 1833(a)(2)(B), the reasonable costs provision, with the very

same January 1, 1999 sunset date.  See BBA § 4523(d), codified at 42 U.S.C. § 1395*l*(a)(2)(B);

see also United American, Slip Op. at 5 (noting apparent gap in payment under subsection

(a)(2)(B)).  Plaintiffs utterly fail to explain how the conforming amendment dealing with the

services at issue here "flatly" terminated payment under the blend rate provisions, but a nearly

identical amendment to the reasonable costs provision had the direct opposite effect – not only

maintaining its viability after the January 1, 1999 sunset date but expanding its reach to

categories of services that had long been excepted from its purview.[15]  Cf. Henry Ford, 233 F.3d

at 910-11 (finding it "implausible that Congress would have intended identical language to have

inconsistent results").

Plaintiffs also inappropriately rely on Congress's extension in 1999 of the reduction of

payments in § 1861(v) as evidence that Congress wished also to extend the reasonable costs

formula while allowing the blend rate to sunset.  Plaintiffs read far more into this amendment

than its language and history will bear.  In § 201(k) of the BBRA, enacted after the agency

notified Congress that it would "delay[] changes" to the payment systems, see Y2K Hearings,

105th Cong., 2d Sess. at 71, Congress extended the 5.8 and 10 percent mandatory reductions in

payment until implementation of the PPS.  Nowhere in the BBRA did Congress extend the

---

[15] Thus, the fact that Congress did not expressly make the retirement of the pre-existing payment methodologies contingent on implementation of the outpatient PPS provides no support for plaintiffs' position, as it applies with equal force to the reasonable cost methodology under which that plaintiffs seek reimbursement.

25

reasonable cost rule itself, however,[16] See 42 U.S.C. § 1395*l*(a)(2)(B) (2000), nor did Congress amend 42 U.S.C. §§ 1395*l*(a)(2)(E) or (a)(4) to specify payment on the basis of reasonable costs for the services at issue. Despite plaintiffs' effort to portray otherwise, these reductions in payment were not solely applicable to calculations under the reasonable costs formula, either, undercutting the inferences plaintiffs draw from their extension. Rather, they apply on their face to the calculation of payments under the blend rates as well. See 42 U.S.C. § 1395x(v)(1)(S)(ii)(IV) (directing that the "cost proportion" of the blend rates be reduced by the appropriate capital or non-capital reduction rate). If anything, the extension of these provisions is an indication of Congress' firm commitment to budgetary restraint, ensuring that the cost reforms intended by the BBA were not wholly negated by the delay in implementing outpatient PPS. Cf. Ball Mem., 2006 U.S. Dist. LEXIS 68226, at *32 (noting that reductions in payment were adopted as "cost-containment measure[s] during the transition to outpatient PPS").

Underlying all of plaintiffs' flawed arguments is the faulty premise that Congress has shown a "long-standing, fundamental intent" to reimburse the full reasonable costs of the services provided. Pls. Br. at 16. The only evidence plaintiffs cite for this contention, however, is a committee report published at Medicare's inception in 1965. See Pls. Br. at 19, citing Senate Report 404, reprinted in 1965 U.S.C.C.A.N., 1943, 1976. That plaintiffs are forced to resort to decades-old indications of congressional intent is telling but certainly not surprising, for the intervening decades have been marked by a steady trend away from cost-based reimbursement. Plaintiffs provide no basis to believe that Congress would abandon this trend sub silentio as part

---

[16] Accordingly, plaintiffs' attempt to read meaning from Congress' failure in 1999 to enact a similar extension of the blend rates, see Pls. Br. at 17, proves too much, as such a negative inference would be equally applicable to the reasonable cost formula.

26

of the same reform package that aimed to move all outpatient services to a fully prospective system.

Plaintiffs also suggest that the prohibition on cross-subsidization – the principle that Medicare beneficiaries should not subsidize non-beneficiaries and vice versa, 42 U.S.C. § 1395x(v)(1)(A) – requires the agency to apply the reasonable cost formula rather than the blend rate methodology during the relevant period.  As a threshold matter, having failed to raise this argument during the notice and comment period, plaintiffs have waived the opportunity to raise it here.  See Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002).  "It is well established that issues not raised in comments before the agency are waived and this Court will not consider them."  Id.; see also Mem'l Hosp. of Tampa v. Thompson, 363 F.3d 1013 (9th Cir. 2004) (applying waiver principle to expedited review of PRRB decision).  This rule "applies with no less force to a statutory interpretation claim not brought to an agency's attention."  Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1298 (D.C. Cir. 2004).  Because none of the comments received by the agency – even those discussing the applicability of the blend rate to the period in question – raised this argument, the agency did not have a "a fair opportunity to pass on" it.  See Nat'l Wildlife, 286 F.3d at 562, quoting Nat'l Ass'n of Mfrs. v. Department of the Interior, 134 F.3d 1095, 1111 (D.C. Cir. 1998).  Accordingly, it cannot be raised here.

Even if this Court were inclined to reach the merits of this argument, however, plaintiffs' claim fails.  The prohibition on cross-subsidization is an unambiguous constraint only on the manner in which reasonable costs may be determined.  42 U.S.C. § 1395x(v)(1)(A); see also 42 C.F.R. § 413.5(a).  Accordingly, plaintiffs' contention that the Secretary's method of payment violated this prohibition assumes the answer to the very question to be decided – whether the

27

Secretary was required to reimburse the services at issue using the reasonable cost rule.[17]  That

this statutory prohibition on cross-subsidization coexisted for years with the statutory provision

on the blend rate is a clear indication that Congress did not see the two in direct tension.  There is

simply no reason to believe that the blend rate would somehow come to violate § 1861(v)(1)(A)

as of January 1, 1999, when it has long been regarded as consonant with it.  Finally, even if these

two statutory policies were in tension, the task of "reconciling conflicting policies" is

quintessentially the province of the agency.  See Chevron, 467 U.S. at 845, quoting United States

v. Shimer, 367 U.S. 374, 382 (1961).

## II.    Continuation of Existing Payment Methods Was Eminently Reasonable

Because Congress left a gap in statutory payment requirements for the relevant period,

plaintiffs face the daunting task of establishing that their construction of the statute is the "only

possible interpretation."  Regions Hospital, 522 U.S. at 460.  They have not only failed to

discharge this burden, but they have also failed to demonstrate that the agency's construction is

itself unreasonable.  Thus, even were it not the case that the agency's construction is far more

reasonable than the one urged by plaintiffs – as is most certainly the case here – summary

judgment for the Secretary would still be warranted.  See Chevron, 467 U.S. at 843; see also

Appalachian Power, 249 F.3d at 1044 n.3 (according Chevron deference to agency's choice

between alternate ways of curing statutory anomaly).

---

[17] For this reason, plaintiffs' reliance on St. Mary of Nazareth Hosp. Ctr. v. Heckler, 760 F.2d 1311, 1315-17 (D.C. Cir. 1985) is misplaced.  That cased involved a violation of the prohibition on cross-subsidization in a situation where the reasonable costs rule was undisputedly applicable.  See St. Mary of Nazareth Hospital Center v. Schweiker, 718 F.2d 459, 461, 468 (D.C. Cir. 1983) (prior proceeding, discussing statutory background).  The case did not hold, as plaintiffs suggest, that the reasonable costs formula supplies some sort of default rule for the entire Medicare program.

### A.    The Secretary's Construction Hewed Most Closely to the Statute and its Purpose

The Secretary's approach to filling the statutory gap is far more faithful to the structure and history of the statute than the construction urged by plaintiffs.  The agency's decision to "continue to pay for [outpatient] service[s] under existing methodolog[ies]" until the PPS could be implemented, 65 Fed. Reg. at 18,490, fully accords with Congress' expectation that the new system would seamlessly replace the old one.  The Secretary therefore reasonably construed the statute to permit for payment under the pre-existing methodologies until the PPS went into effect. See id. This construction is bolstered by the fact that Congress provided sunset dates for the blend rate and the reasonable cost methodology alike, evidencing no intent to change the status quo until a fully prospective payment system could replace the existing methodologies. Although the Y2K computer crisis prevented this substitution from being effected on January 1, 1999, as Congress appeared to have anticipated, the Secretary responded to this "unforeseen situation[] . . . in a manner consistent with Congress' general intent," Haggar Apparel, 526 U.S. at 392-93, by accomplishing the same substitution as soon as possible thereafter.

It would have been a far greater deviation from both the statutory text and Congress' clear intent for the agency to have interposed between the pre-existing blend rate methodology and the new outpatient PPS an entirely separate payment scheme that Congress had abandoned many years before.  Yet this is precisely what plaintiffs seek.  Surgical, radiology, and diagnostic services had long been paid according to the blend rate, consistent with Congress' express directive.  To reinstate the long-abandoned reasonable cost formula for these services without clear direction from Congress would have required the kind of "adventurous transplant operation" that plaintiffs themselves recognize is foreclosed.  See Mova, 140 F.3d at 1069; see

29

also Pls. Br. at 23.  Plaintiffs fail to explain how the "more narrow solution," Mova, 140 F.3d at 1069, to the gap in payment methods would have been to reimburse providers under a provision, § 1833(a)(2)(B), that was *both* lapsed and inapplicable to the particular services in question, than simply to continue to pay for the services after January 1, 1999, under the existing payment methods.

The Secretary's construction is all the more reasonable in light of the overall aim of the BBA to "reduc[e] the rate of growth of Medicare spending for outpatient services."[18]  H.R. Rep. No. 105-149 at 1392; see also Regions Hosp., 522 U.S. at 460 (concluding that agency construction was reasonable because, inter alia, it was consistent with purpose of enactment to "limit payments to hospitals").  Far from evincing an intent to revert to old retrospective payment methods and the ballooning Medicare outlays that this would entail, Congress indicated that it wished to commit more fully to prospective, fixed-rate payment.  It would have done serious violence to this congressional purpose to abandon the blend rate's partially-prospective methodology after January 1, 1999, all because the agency was delayed in implementing a fully prospective payment system.  The blend rate was intended, after all, to "begin easing hospitals toward a method of reimbursement based on a set fee rather than on the hospital's cost[s]." Henry Ford, 233 F.3d at 909.  It was hardly unreasonable for the agency to refuse to reverse

---

[18] Plaintiffs suggest that the "overarching legislative purpose" is irrelevant to the propriety of the Secretary's decision.  Pls. Br. at 25.  The cases they cite for this proposition, however, are easily distinguishable, as they involve situations in which the agency relied on a general legislative purpose to contravene the clear and coherent language of a statute.  See, e.g., Barnhart v. Sigmon Coal Co., 534 U.S. 438, 460-61 (2002) (noting Congress's "delicate crafting" of "clear and unambiguous" language); Engine Mfrs., 88 F.3d at 1091-1092 (contrasting "clear statutory language" with lack of any coherent indication of congressional intent).  Where the statute is ambiguous in its language, structure, or overall coherency, courts routinely uphold agency interpretations by reference to an overarching legislative purpose.  See, e.g., Regions Hosp., 522 U.S. at 460.

course in the absence of explicit congressional direction.  <u>Cf.</u> <u>Ball Mem.</u>, 2006 U.S. Dist. LEXIS

68226, at *31 (agency's refusal to "maintain [] an 'island' where reasonable-cost reimbursement

would continue to reign unchecked" was reasonable).

**B.     The Secretary Had No Obligation to Treat Different Services Similarly**

Plaintiffs also argue that it was arbitrary and capricious for the agency to apply the blend

rates to outpatient surgical, radiology, and other diagnostic procedures but to reimburse certain

other services for their full reasonable costs even after December 31, 1998.  Plaintiffs have

waived the right to seek review of this claim.  <u>See</u> <u>Nat'l Wildlife</u>, 286 F.3d at 562.  None of the

comments submitted in connection with the proposed rule raised this issue, even though the

public was on notice that the Secretary would continue paying under the existing payment

scheme, 63 Fed. Reg. 47,606 – a scheme that itself contemplates different types of

reimbursement for different categories of outpatient services.  Because plaintiffs' challenge was

not raised, the agency could not have acted arbitrarily and capriciously by failing to address the

contention.  <u>See</u> <u>Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.</u>,

429 F.3d 1136, 1149-50 (D.C. Cir. 2005).

And certainly, on the merits of this contention, it is not arbitrary or capricious to

distinguish between types of services that Congress itself has seen fit to treat differently.  <u>See</u> <u>Air</u>

<u>Line Pilots Ass'n v. Quesada</u>, 276 F.2d 892, 898 (2d Cir. 1960) (agency differentiation

reasonable where statute itself "contemplates just such distinctions").  Put simply, the Secretary

did not suddenly treat similar situations differently after 1999, <u>see</u> Pls. Br. at 26, but instead

treated different situations consistently.  The Secretary maintained existing distinctions between

different types of services, including the types of services identified in plaintiffs' brief.  <u>Compare</u>

31

42 C.F.R. §§ 413.118, 413.122 (1998) (providing blend rate for outpatient surgery, radiology, and diagnostic procedures) with id. § 415.202 (1998) (providing for reimbursement of reasonable costs for services of residents in non-approved GME programs) and § 415.160 (1998) (permitting teaching hospitals to elect reasonable costs for direct physician services).[19]  Because the different services were already being paid for under different methodologies, this naturally gave rise to different treatment when those same methodologies were carried forward.  The reasonableness of this differentiation therefore rises and falls, as the rest of plaintiffs' claim, on whether it was permissible for the Secretary to continue to pay hospitals under the methods already in place as of January 1, 1999.

In sum, because the agency made a "reasonable choice within a gap left open by Congress," plaintiffs' challenge must fail.  Chevron, 467 U.S. at 866.  Unable to move as quickly as it would have liked toward implementation of an across-the-board PPS and lacking any express direction from Congress about how to make payments in the interim before PPS could be implemented, it was entirely reasonable for the agency to continue to pay the services in question under the blended payment rate according to which they had been paid for more than a decade. Because this approach "fits 'the design of the statute as a whole and . . . its object and policy." Good Samaritan, 508 U.S. at 417-18, it must be upheld.

## III.     Continued Application of the Existing Payment Scheme Was Not Impermissibly Retroactive

Finally, plaintiffs contend – albeit selectively – that the Secretary's extension of the pre-existing payment system runs afoul of the presumption against retroactive rulemaking set forth in

---

[19] Indeed, Congress expressly provided for this election of costs, so long as teaching hospitals agree to certain conditions.  See 42 U.S.C. § 1395x(b)(7).

<u>Bowen v. Georgetown University Hospital</u>, 488 U.S. 204 (1988).[20]  Yet the "rule" they would have the Secretary substitute for the blend rate methodology would be undisputably retroactive. By contrast, the use of the blend rate methodology merely maintained the statue quo until the new outpatient PPS took effect.  Among all the options available to the agency in the face of a gap in payment systems, the agency chose the one approach that would not upset any settled expectations.

To determine whether a rule has true retroactive effect, courts must examine "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."  <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 269-270 (1994). This inquiry involves a "commonsense,  functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'"  <u>Martin v. Hadix</u>, 527 U.S. 343, 357-58 (1999), <u>quoting</u> <u>Landgraf</u>, 511 U.S. at 270.

Here, plaintiffs do not challenge the retroactive application of a new regulation, but rather the agency's failure to repeal existing regulations – specifically 42 C.F.R. §§ 413.118 and 413.122.  <u>See</u> Caritas A.R. at 1 (PRRB's characterization of appeal); Chippewa Valley A.R. at 4 (same); Baptist Memorial A.R. at 2 (same).  Accordingly, <u>Georgetown University Hospital</u> is plainly distinguishable.  That case involved an agency's *changes* in the methods used to

---

[20] In their complaint, plaintiffs also allege the Secretary violated the Due Process Clause by failing to give them adequate notice of the applicable payment method.  <u>See</u> Caritas Amended Compl. ¶ 73(g); Baptist Mem. Compl. § 77(G); Chippewa Compl. ¶ 64(G).  Plaintiffs do not raise this issue in their motion for summary judgment, and it is therefore waived.  Moreover, because HHS's rulemaking did not retroactively upset settled expectations, <u>a fortiori</u> it did not give rise to any due process violations.  <u>See</u> Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Plaintiffs had no vested right to reimbursement under a scheme neither mandated by, nor consistent with, the statute.  <u>See</u> Parts I & II, <u>supra</u>.  Moreover, the proposed rule implementing the BBA put the public on notice that they would be paid under the "existing payment system." 63 Fed. Reg. at 47,606.

compute costs," 488 U.S. at 211 (emphasis altered from original), not its failure to amend existing payment methods to plaintiffs' liking, as here.  During the relevant interim period, the Secretary did not apply its blend rate regulations to any new services or otherwise break with prior practice.  Because this approach did not "attach new legal consequences" to services already rendered, see Martin, 527 U.S. at 357-58, nor did it involve the involve "application of any *new* reimbursement principles," it did not have truly retroactive effect.  See Regions Hospital, 522 U.S. at 456 (emphasis added); see also Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 744 n.3 (1996).  In fact, the agency decided to maintain the existing system during the reimbursement gap precisely in order to avoid retroactively applying a new scheme at the time the final rule was issued.  See 65 Fed. Reg. 18,490.

Just as critically, plaintiffs can claim no right to be paid under the reasonable cost rule for surgical, radiology, or other diagnostic procedures, because Medicare had not paid for those services on a reasonable cost basis for more than a decade and both the Medicare statute and the Secretary's regulations provided for payment on a different basis – the one plaintiffs challenge here.  See Henry Ford, 233 F.3d at 911.  Thus, the Secretary's rulemaking did not impair any vested right that plaintiffs possessed, the hallmark of retroactivity.  See Landgraf, 511 U.S. at 289 (1994).  Since plaintiffs had no plausible claim to reimbursement under a reasonable cost rule long abandoned for the services in question, the agency's interpretation creates no "unfair surprise."  Long Island Care at Home, Ltd. v. Coke, 127 S. Ct. 2339, 2349 (2007).  Although plaintiffs would prefer reasonable cost reimbursement because it would apparently be more remunerative, resurrecting this long-since abandoned payment method would create the very retroactivity problems of which plaintiffs complain.

34

Plaintiffs' invocation of the presumption against retroactivity simply proves too much, as the only course of action that entirely avoids what plaintiffs characterize as retroactivity – that is, application of a payment method not expressly provided by Congress for the period in question – would be the absence of any payment at all.[21]  The methodology plaintiffs challenge had been in place for many years, whereas plaintiffs' preferred methodology would be a drastic departure from the pre-1999 status quo.  The agency chose the most "commonsense, functional" approach to avoid the specter of retroactivity – continuing to pay under the existing system until it could be substituted for the outpatient PPS going forward.  See Martin, 527 U.S. at 357-58.

**IV.    This Court Lacks Jurisdiction Over Claims Not Properly Appealed to the PRRB**

Finally, this Court does not have subject matter jurisdiction to entertain the claims of plaintiff Clallam County Public Hospital District (Olympic Memorial Hospital), see Chippewa Complaint ¶ 11(o), because the provider did not timely appeal from the Notice of Program Reimbursement.  See Chippewa A.R. 1-10.  Judicial review of actions arising under the Medicare Act "may be had only after the claim has been presented to the Secretary and administrative remedies have been exhausted."  Am. Chiropractic Ass'n v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005); Shalala v. Ill. Council on Long Term Care, 529 U.S. 1 (2000).  The provider was entitled to pursue an appeal to the PRRB on its claims for additional payment, so long as it did so in a timely manner.  See 42 U.S.C. § 1395oo.  Having failed to do so, it cannot seek review in this Court. See Three Lower Counties Cmty. Health Servs. v. U.S. Dept. of Health & Human Servs.,

---

[21] For this reason, even if the rule were retroactive, it would nevertheless fall within the admittedly narrow category of cases that can overcome the presumption against retroactivity because the language of the congressional enactment "requires this result," see Georgetown Univ. Hosp., 488 U.S. at 208, in order to save the statute from the clear absurdity of a total lapse in Medicare reimbursements.

517 F. Supp. 2d 431, 435 & n.4  (D.D.C. 2007).

This Court also lacks jurisdiction over challenges to Medicare payments for cost

reporting periods that were not properly appealed before the PRRB.  Thus, even if this Court

were to conclude that plaintiffs' construction is the only permissible construction of the statute,

plaintiffs would still not be entitled to the relief they seek: an order "requiring the Secretary

promptly to reimburse the plaintiff hospitals for the full amount of their reasonable costs of

services furnished to Medicare outpatients on or after January 1, 1999 and before August 1, 2000.

. . ." Caritas Amended Compl. ¶ 74(B) (emphasis added).  Rather, in that event plaintiffs would

be entitled only to reimbursement for the reasonable costs of the services at issue *for the cost

reporting periods appealed to the PRRB* and not for any periods plaintiffs failed to appeal.

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for summary judgment should be denied

and summary judgment should be granted in favor of the Secretary.


Dated: August 4, 2008                    Respectfully submitted,

                                         GREGORY G. KATSAS
                                         Assistant Attorney General

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         SHEILA LIEBER
                                         Deputy Branch Director, Federal Programs Branch

                        By:      /s/ Kyle R. Freeny
                                 KYLE R. FREENY (California Bar # 247857)
                                 Trial Attorney
                                 U.S. Department of Justice, Civil Division
                                 P.O. Box 883, Washington, DC  20044
                                 Telephone:  (202) 514-5108

36

Facsimile:   (202) 616-8202
Email:  Kyle.Freeny@usdoj.gov
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| CARITAS MEDICAL CENTER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-01889 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

_____

|  |  |
|---|---|
| BAPTIST MEMORIAL HOSPITAL- | ) |
| MISSISSIPPI COUNTY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-02197 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| | ) |
| Defendant. | ) |

_____

|  |  |
|---|---|
| CHIPPEWA VALLEY HOSPITAL & | ) |
| OAKVIEW CARE CENTER, INC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-2329 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United  States Department of Health | ) |
| and Human Services, | ) |
| | ) |
| Defendant. | ) |

_____

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.l, defendant responds, by and through undersigned counsel, to plaintiffs' statement of material facts as to which there is no genuine issue, as follows. Plaintiffs' numbered statements are reproduced below, each followed by defendant's response.

1.      The Plaintiffs in these three consolidated actions are a group of 166 hospitals. Amended Complaint, Caritas Medical Center, et al. v. Leavitt, No. 07-1889 (RMU) (D.D.C. Nov. 28, 2007) ("Caritas Comp.) and Answer ¶¶ 7-20; Complaint, Baptist Memorial Hosp. – Mississippi County, Inc., et al. v. Leavitt, No. 07-2197 (RMU) (D.D.C. Dec. 6, 2007) ("Baptist Memorial Comp.") and Answer ¶¶ 7-24; Complaint, Chippewa Valley Hospital & Oakview Care Center, Inc., et al. v. Leavitt, No. 07-2329 (RMU) (D.D.C. Dec. 28, 2007) ("Chippewa Valley Comp.) and Answer ¶¶ 7-11.

**Response:**      Undisputed that plaintiffs are a group of hospitals.

2.      The defendant in these three consolidated actions is Michael O. Leavitt, the Secretary of the United States Department of Health and Human Services, which is the federal agency which administers the Medicare program. Caritas Comp. and Answer ¶ 21, Baptist Memorial Comp. and Answer § 25, Chippewa Valley Comp. and Answer ¶ 12.

**Response:**      Undisputed.

3.      During the period at issue, beginning January 1, 1999 and ending July 31, 2000, each of the Plaintiff Hospitals participated in the Medicare program as a provider of hospital services. See Caritas Comp. and Answer ¶ 65; Baptist Memorial Comp and Answer ¶ 69; Chippewa Valley Comp. and Answer ¶ 56.

2

**Response:**    Undisputed.

4.    The nature of the dispute concerns Defendant's application of certain blended payment rate limits ("the Limits") on Medicare reimbursement for covered outpatient services furnished by the Plaintiff Hospitals during the period from January 1, 1999 through July 31, 2000. See 65 Fed. Reg. 18434, 18490 (Apr. 7, 2000).

**Response:**    It is undisputed that this case concerns Defendant's payment of Plaintiff Hospitals using blended payment rates, or "blend rates," see 42 U.S.C. §§ 1395*l*(i)(3), (n), for outpatient ambulatory surgical center (ASC) procedures, radiology services, and other diagnostic procedures furnished during the period from January 1, 1999 through July 31, 2000. See Caritas Administrative Record ("A.R.") at 1; Chippewa Valley A.R. at 4; Baptist Memorial A.R. at 2. Defendant disputes plaintiffs' characterization of the blend rates as a "Limit" and asserts that it instead is a separate statutory basis for paying for the services in question. See 42 U.S.C. §§ 1395*l*(a)(2)(E), (a)(4).

5.    Each of the Plaintiff Hospitals submitted one or more Medicare cost reports, encompassing a portion of the period beginning January 1, 1999 through August 1, 2000, for a determination by the Secretary's fiscal intermediary of the amount of reimbursement owed the hospital by the Medicare program for hospital outpatient services to Medicare beneficiaries. See Caritas Comp. and Answer ¶¶ 67-68; Baptist Memorial Comp. and Answer ¶¶ 71-72; Chippewa Valley Comp. and Answer ¶¶ 58-59.

**Response:**    Undisputed.

6.    For each of these cost reports, the fiscal intermediary issued a Notice of Program Reimbursement ("NPR"). See Caritas Comp. and Answer ¶ 69; Baptist Memorial Comp. and Answer ¶ 73; Chippewa Valley Comp. and Answer ¶ 60. In issuing those payment

3

determinations in the NPRs, the intermediaries were required to apply the Limits to the costs of ambulatory surgical, radiology, and diagnostic services furnished on or after January 1, 1999 and before August 1, 2000.  See 65 Fed. Reg. at 18490.

**Response:**     It is undisputed that the relevant fiscal intermediaries issued Notices of Program Reimbursement (NPRs) for the cost reports submitted by Plaintiffs during the relevant time period.  The obligation of the intermediaries to apply the blend rate is a conclusion of law, not an assertion of fact, but it is undisputed.

7.     As a result of the application of the Limits, the Plaintiff Hospitals received reimbursement for cost reporting periods at issue in amounts less than the reasonable costs actually incurred by the hospitals in providing hospital outpatient services to Medicare beneficiaries. See Caritas Comp. and Answer ¶ 70; Baptist Memorial Comp. and Answer ¶ 74; Chippewa Valley Comp. and Answer ¶ 61; see also 65 Fed. Reg. at 18490.

**Response:**     Defendant does not dispute that the blend rate methodology applied to outpatient surgery, radiology, and other diagnostic procedures provides for payment of the lesser of reasonable costs or blended payment amount, see 42 U.S.C. § 1395*l*(i)(3), (n), and that if the reasonable cost of providing the relevant services was greater than the blended payment amount as determined by the fiscal intermediaries, plaintiffs would have been paid the latter amount.

8.     After the fiscal intermediaries issued NPRs for the cost reporting periods at issue, the Plaintiff Hospitals timely appealed such determinations to the Provider Reimbursement Review Board ("PRRB"). See Caritas Comp. and Answer ¶ 71; Baptist Memorial Comp. and Answer ¶ 75; Chippewa Valley Comp. and Answer ¶ 62.

**Response:**     It is undisputed that plaintiffs pursued administrative appeals to the PRRB for at least one cost reporting period overlapping with the period January 1, 1999 through July 31,

4

2000.  Defendant disputes that every plaintiff hospital appealed to the PRRB for *each* cost reporting period overlapping with the period January 1, 1999 though July 31, 2000.  See, e.g., Caritas A.R. at 5, line 19; Chippewa A.R. at 6, line 9.  Defendant also disputes that Plaintiff Clallam County Public Hospital District (Olympic Memorial Hospital) properly pursued an appeal.  Chippewa Valley A.R. at 1-10.  The timeliness of the appeals is not an assertion of fact, but rather a conclusion of law; however, it is not disputed except with respect to Clallam County Public Hospital District (Olympic Memorial Hospital), and the cost reporting periods between January 1, 1999 and July 31, 2000 that were not the subject of an appeal to the PRRB on the payment issue that is the subject of this dispute.

9.      In each of the administrative appeals, the PRRB granted the hospitals' request for expedited judicial review of the Secretary's application of the Limits to determine reimbursement for the periods at issue.  See Caritas Comp. and Answer ¶ 72; Baptist Memorial Comp. and Answer ¶ 76; Chippewa Valley Comp. and Answer ¶ 63.

**Response:**      Defendant disputes that plaintiff Clallam County Public Hospital District (Olympic Memorial Hospital) was granted expedited judicial review.  See  Chippewa A.R. at 1-10.  Defendant also disputes plaintiffs' characterization of the blend rate as a "limit."  The remainder of the paragraph is undisputed.

10.     The Plaintiff Hospitals subsequently filed three separate actions for judicial review by this Court pursuant to the PRRB's decisions granting expedited judicial review in the administrative appeals.

**Response:**      The basis for plaintiffs' actions is a conclusion of law, not a factual assertion, although Defendant admits that three separate actions were filed in this Court.

11.     On January 31, 2008, the Parties jointly moved this Court to consolidate all three

5

cases for purposes of joint briefing on motions for summary judgment. On February 11, 2008,

the Court granted the joint motion in Caritas Medical Center, et al. v. Leavitt, No. 07-1889

("Caritas"), the earliest-numbered of the three actions. The Court's Calendar and Case

Management Committee subsequently reassigned the other two actions, Baptist Memorial Hosp.

- Mississippi County, Inc., et al. v. Leavitt, No. 07-2197 and Chippewa Valley Hospital &

Oakview Care Center, Inc., et al. v. Leavitt, No. 07-2329, to the judge in Caritas, for

consolidated briefing and hearing on motions for summary judgment.

**Response:**    Undisputed.


Dated: August 4, 2008                          Respectfully submitted,

                                               GREGORY G. KATSAS
                                               Assistant Attorney General

                                               JEFFREY A. TAYLOR
                                               United States Attorney

                                               SHEILA LIEBER
                                               Deputy Branch Director, Federal Programs Branch

                              By:    /s/ Kyle R. Freeny
                                     KYLE R. FREENY (California Bar # 247857)
                                     Trial Attorney
                                     U.S. Department of Justice, Civil Division
                                     P.O. Box 883, Washington, DC  20044
                                     Telephone:  (202) 514-5108
                                     Facsimile:  (202) 616-8202
                                     Email:  Kyle.Freeny@usdoj.gov
                                     *Counsel for Defendants*

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| CARITAS MEDICAL CENTER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-01889 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

|  |  |
|---|---|
| BAPTIST MEMORIAL HOSPITAL- | ) |
| MISSISSIPPI COUNTY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-02197 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United States Department of Health and | ) |
| Human Services, | ) |
| | ) |
| Defendant. | ) |

_____

|  |  |
|---|---|
| CHIPPEWA VALLEY HOSPITAL & | ) |
| OAKVIEW CARE CENTER, INC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-2329 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary, | ) |
| United States Department of Health | ) |
| and Human Services, | ) |
| | ) |
| Defendant. | ) |

_____

**DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.l, defendant submits, by and through the undersigned counsel, the following statement of additional material facts as to which there is no genuine issue.

1. The agency published its proposed rule to implement the amendments enacted by section 4523of the Balanced Budget Act of 1997 (BBA) on September 8, 1998. See 63 Fed. Reg. 47,522, 47,606 (Sept. 8, 1998). In that proposed rule, the agency notified the public that the outpatient prospective payment system (PPS) authorized by the BBA would be delayed until after the January 2000. Id. at 47,554.

2. The agency needed to direct substantial resources toward avoiding the so-called Year 2000 or Y2K computer crisis. See 63 Fed. Reg. at 47,605. Implementation of the outpatient PPS was delayed as a result, because it would "divert resources from the Y2K project," creating a "real danger that basic [Medicare] enrollment and claims processing activities [would] be disrupted." Id.

3. The agency notified Congress that the Y2K crisis needed to take priority over other agency initiatives and that the outpatient PPS would as a consequence be delayed. See generally The Year 2000 Computer Problem: Will the Health Care Industry Be Ready? : Hearing Before Senate Special Committee on the Year 2000 Technology Problem, ("Y2K Hearings"), 105th Cong., 2d Sess. (1998).

4. The agency issued its final rule implementing the outpatient PPS on April 7, 2000. 65 Fed. Reg. 18,434 (Apr. 7, 2000). The agency designations under outpatient PPS went into effect on August 1, 2000. 65 Fed. Reg. 40535 (June 30, 2000).

5.    No comments received during the notice-and-comment period for the outpatient PPS rule recommended that the Secretary apply the new PPS retroactively to services furnished on or after January 1, 1999, and the Secretary rejected this approach.  65 Fed. Reg. at 18,489. HHS acknowledged that it was "possible to read the statute in such a way that an outpatient service furnished after January 1, 1999 but not yet designated as a covered outpatient service by HCFA for purposes of PPS would have no payment methodology applicable to it."  65 Fed. Reg. at 18,489-90.  Ultimately, it concluded that the statute "authorizes the Secretary to continue to pay for the service[s] under the existing methodolog[ies] until PPS can be implemented."  Id. at 18,490.

6.    The Secretary received nine comments challenging the applicability of the blend rate after January 1, 1999.  See Rulemaking Record (R.R.) at 758-60, 803-05, 819-820, 832-33, 835, 844-45, 865-66, 879, 902.  None of these comments suggested that it was arbitrary or capricious for the Secretary to distinguish for payment purposes between outpatient surgical, radiology, and other diagnostic procedures, on the one hand, and other types of services on the other.  Id. at 744-907.  Nor did any of these comments contend that the continued applicability of the blend rate violated the prohibition on cross-subsidization in § 1861 of the Social Security Act.  Id.

7.    Plaintiff hospitals were paid under the blend rate methodology for outpatient surgery, radiology, and other diagnostic procedures furnished between January 1, 1999, and the implementation of outpatient PPS in August 1, 2000.  Caritas Administrative Record ("A.R.") at 1-2; Chippewa A.R. at 3-4; Baptist Mem. A.R. at 1-2.

8.    The dispute in this case relates only to Medicare's payment for outpatient surgical, radiology, and other diagnostic procedures; payment for other types of outpatient

services is not at issue.  See Caritas A.R. 33-79, 37; Baptist A.R. 80-120, 84; Chippewa A.R.

554-593, 557.  Prior to January 1, 1999, outpatient surgery, radiology, and other diagnostic

procedures had been paid under the blend rate methodology.  42 U.S.C. §§ (a)(2)(E), (a)(4),

(i)(3), (n)(1).

       9.     By letter dated November 1, 2007, plaintiff Clallam County Public Hospital

District (Olympic Memorial Hospital), Provider No. 50-0072, withdrew its request to participate

in the relevant group appeal before the Provider Reimbursement Review Board (PRRB), an

administrative tribunal within the United States Department of Health and Human Services.

Chippewa A.R. 10.  Subsequently, the PRRB concluded that it lacked jurisdiction over the

claims of plaintiff Olympic Memorial for its fiscal year ending December 31, 2000, and

dismissed the provider from the relevant group appeal.  Id. at 1-2.  The PRRB did not grant the

provider expedited judicial review with respect to the issues in this case for any cost reporting

periods relevant to this case.  Id. at 1-10.

Dated: August 4, 2008                 Respectfully submitted,

                                      GREGORY G. KATSAS
                                      Assistant Attorney General

                                      JEFFREY A. TAYLOR
                                      United States Attorney

                                      SHEILA LIEBER
                                      Deputy Branch Director, Federal Programs Branch

                      By:    /s/ Kyle R. Freeny
                                      KYLE R. FREENY (California Bar # 247857)
                                      U.S. Department of Justice, Civil Division
                                      P.O. Box 883, Washington, DC  20044
                                      Telephone:  (202) 514-5108
                                      Facsimile:  (202) 616-8202
                                      Email:  Kyle.Freeny@usdoj.gov
                                      Counsel for Defendants

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ )<br>CARITAS MEDICAL CENTER, et al., )<br> )<br>    Plaintiffs, )<br> )<br>        v. )<br> )<br>MICHAEL O. LEAVITT, Secretary, )<br>United States Department of Health and )<br>Human Services, )<br> )<br>    Defendant. )<br> )<br>_____ ) | Civil Action No. 1:07-CV-01889 (RMU) |
| BAPTIST MEMORIAL HOSPITAL-<br>MISSISSIPPI COUNTY, et al., )<br> )<br>    Plaintiffs, )<br> )<br>        v. )<br> )<br>MICHAEL O. LEAVITT, Secretary, )<br>United States Department of Health and )<br>Human Services, )<br> )<br>    Defendant. )<br>_____ ) | Civil Action No. 1:07-CV-02197 (RMU) |
| CHIPPEWA VALLEY HOSPITAL &<br>OAKVIEW CARE CENTER, INC, et al., )<br> )<br>    Plaintiffs, )<br> )<br>        v. )<br> )<br>MICHAEL O. LEAVITT, Secretary, )<br>United  States Department of Health )<br>and Human Services, )<br> )<br>    Defendant. )<br>_____ ) | Civil Action No. 1:07-CV-2329 (RMU) |

## **PROPOSED ORDER**

Upon consideration of the parties' cross-motions for summary judgment and any

memoranda in support thereof and opposition thereto, it is hereby:

ORDERED that defendant's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that plaintiffs' motion for summary judgment is DENIED.

SO ORDERED, this _____ day of _____, 2008.


_____
The Honorable Ricardo M. Urbina
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CARITAS MEDICAL CENTER, et al.,                  )
                                                  )
          Plaintiffs,                             )
                                                  )
             v.                                   )   Civil Action No. 1:07-CV-01889 (RMU)
                                                  )
MICHAEL O. LEAVITT, Secretary,                    )
United States Department of Health and            )
Human Services,                                   )
                                                  )
          Defendant.                              )
_____          )
                                                  )
BAPTIST MEMORIAL HOSPITAL-                         )
MISSISSIPPI COUNTY, et al.,                        )
                                                  )
          Plaintiffs,                             )
                                                  )
             v.                                   )   Civil Action No. 1:07-CV-02197 (RMU)
                                                  )
MICHAEL O. LEAVITT, Secretary,                    )
United States Department of Health and            )
Human Services,                                   )
                                                  )
          Defendant.                              )
_____          )
                                                  )
CHIPPEWA VALLEY HOSPITAL &                         )
OAKVIEW CARE CENTER, INC, et al.,                  )
                                                  )
          Plaintiffs,                             )
                                                  )
             v.                                   )   Civil Action No. 1:07-CV-2329 (RMU)
                                                  )
MICHAEL O. LEAVITT, Secretary,                    )
United  States Department of Health               )
and Human Services,                               )
                                                  )
          Defendant.                              )
_____          )

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED AMERICAN INSURANCE CO.,<br><br>    Plaintiff,<br><br>v.<br><br>TOMMY THOMPSON, Secretary of<br>the Department of Health and<br>Human Services,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 99-2493 (RWR)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

JUL 31 2002

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

Plaintiff United American Insurance Company ("United American") filed this lawsuit to compel the Secretary of Health and Human Services to designate hospital outpatient services for coverage under the prospective payment system ("PPS") under Part B of the Medicare Program. The Secretary subsequently promulgated regulations designating covered services for payment under the PPS, but did not make the payments retroactive to January 1, 1999. Because the governing statute is not clear and unambiguous and because the Secretary's interpretation of the statute not to require retroactive payment is a reasonable and permissible interpretation, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.

64

- 2 -

## BACKGROUND

The Balanced Budget Act of 1997 amended the Social Security Act to establish a prospective payment system for certain hospital outpatient services.  The new statute specifically provided that "covered OPD services (as defined in subparagraph (B)) furnished during a year beginning with 1999" would be paid under the PPS "established by the Secretary in accordance with this subsection."  42 U.S.C. § 1395l(t)(1)(A) (West 2000). Subparagraph (B) defined "covered OPD services" as those "hospital outpatient services designated by the Secretary."  42 U.S.C. § 1395l(t)(1)(B)(i).

After passage of the Balanced Budget Act, serious concerns arose throughout the public and private sectors regarding the potential effect that the arrival of the year 2000 would have on computer systems (the "Y2K" problem).  Although the Secretary had published proposed regulations in September 1998 to implement the PPS, the Secretary later determined that resolution of the Y2K problem had to take precedence over other projects, including the PPS.  The Secretary advised Congress of her concerns regarding the Y2K problem and her decision to delay implementation of the PPS until after the Y2K issue was resolved.  Congress agreed that the Y2K problem was a top priority and encouraged the Secretary to devote sufficient personnel resources to the issue.

- 3 -

January 1, 2000 passed without incident and the Secretary turned her attention to other important issues, including the PPS.  On April 7, 2000, the Secretary promulgated final regulations to implement the PPS.  The Secretary designated certain services as "covered OPD services" to take effect on July 1, 2000.  Because of implementation difficulties, the final effective date was August 1, 2000.  Although the Secretary considered making payments under the PPS retroactively to January 1, 1999, she interpreted the statute to allow prospective payments and she decided against retroactive payments.

Plaintiff argues that the Secretary was required by the statute to implement the PPS on January 1, 1999.  Plaintiff also argues that the regulations designating covered OPD services, effective August 1, 2000, must be applied retroactively to January 1, 1999.  Defendant responds that the Secretary's interpretation of the statute -- that it does not impose a deadline for the Secretary to promulgate regulations and does not require retroactive payments for services provided before they are designated by the Secretary as "covered services" -- is a reasonable and permissible construction.  Defendant also responds that the Secretary's decision to apply the PPS prospectively rather than retroactively was not arbitrary or capricious.

- 4 -

DISCUSSION

I.   Statutory Construction

"When a court reviews an agency's construction of the
statute which it administers, it is confronted with two
questions.  First, always, is the question whether Congress has
directly spoken to the precise question at issue." Chevron,
U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
837, 842 (1984).  "If the intent of Congress is clear, that is
the end of the matter; for the court, as well as the agency, must
give effect to the unambiguously expressed intent of Congress."
Id. at 842-43.  If the statute does not clearly address the
issue, the Court must decide whether the agency's interpretation
is "based on a permissible construction of the statute." Id. at
843; Arizona v. Thompson, 281 F.3d 248, 253 (D.C. Cir. 2002);
Transitional Hospitals Corp. v. Shalala, 222 F.3d 1019, 1024
(D.C. Cir. 2000).  A statute is not unambiguous if it can be
reasonably interpreted in different ways.  See McCreary v.
Offner, 172 F.3d 76, 82-83 (D.C. Cir. 1999) (finding a statute
ambiguous where other circuit courts, while finding the statute
unambiguous, interpreted the statute differently).

It is undisputed that Congress did not establish a deadline
for the Secretary to designate the "covered OPD services" which,
if furnished on or after January 1, 1999, would be paid under the

PPS.  More importantly for purposes of this case, Congress did
not express unambiguously its intent regarding how payments under
the PPS would be handled where the services were provided after
January 1, 1999, but before the services were designated by the
Secretary as "covered services" for purposes of the PPS.

Plaintiff argues that the language in § 1833(a)(2)(B) of the
Social Security Act has meaning beyond simply being a "sunset"
provision for the old payment system; it also indicates clear and
unambiguous Congressional intent that OPD services would be paid
under the PPS beginning January 1, 1999, regardless of when the
services were designated by the Secretary as "covered OPD
services."  Under this sunset provision, the prior payment system
would be used for outpatient services furnished before January 1,
1999, and payment for outpatient services furnished on or after
January 1, 1999 would be "determined under subsection (t)."  42
U.S.C. § 1395l(a)(2)(B).  It appears that unless the payments for
covered OPD services under the PPS are made retroactively to
January 1, 1999, there is a gap between that date and the date
the service is designated by the Secretary during which no
payment system is in place.  For this reason, plaintiff's
interpretation of the statute seems reasonable.

It seems less likely, however, that Congress intended the
interpretation urged by plaintiff when the effect of that

interpretation over time is considered.  Under plaintiff's
interpretation, if at any times in the future, the Secretary
newly designates particular services as covered OPD services,
then all payments for all such services provided after January 1,
1999 would have to be recalculated retroactively.  The immense
burden of recalculating payments after many years, or even many
decades, could work against the Secretary designating additional
services for coverage under the PPS in the future.  It seems
unlikely that Congress would have enacted a statute for more
beneficial payments for covered OPD service, yet intended an
interpretation of that statute which provides a disincentive for
the Secretary to designate such services.

The statute provides that "covered OPD services," defined as
hospital outpatient services designated by the Secretary,
furnished after January 1, 1999 will be paid under the PPS
system.  It is a reasonable interpretation of the statute that
the services must be "covered OPD services" when they are
furnished to be entitled to payment under the PPS.  Under this
interpretation, whenever the Secretary designates a service for
coverage under the PPS, payments for that service are calculated
under the PPS prospectively from the date the designation is
effective.  This removes any disincentive for the designation of
additional services in the future.  This interpretation is also

consistent with the language of § 1395l(t) but, as is discussed above, it does not address the effect of the sunset provision and the apparent gap that results from a delayed designation of covered services.

Each of these two interpretations of the statute is reasonable, and each of these two interpretations is -- for different reasons -- flawed.  In all likelihood, Congress expected that most services which were to be covered would be designated by January 1, 1999 or very soon thereafter.  Congress does not seem to have anticipated the delay caused by the Y2K concerns and, therefore, did not address clearly and unambiguously how payment for services provided during that unanticipated delay would be calculated when the services were eventually designated by the Secretary as "covered OPD services." Since Congress did not answer that issue clearly and unambiguously, the question before the Court under Chevron is whether the Secretary's construction of the statute to permit her to delay the designation of "covered OPD services" beyond January 1, 1999 and to calculate payment for the covered services prospectively is a permissible one.  Chevron, 467 U.S. at 843. An agency's construction of a statute must be permissible to survive Chevron scrutiny, but it does not need to be the only permissible construction.  Chevron, 467 U.S. at 843 n.11; County

- 8 -

of Los Angeles v. Shalala, 192 F.3d 1005, 1013 (D.C. Cir. 1999),
cert. denied, 530 U.S. 1240 (2000).  Indeed, the Secretary's
construction does not need to be the best interpretation of the
statute.  Atlantic Mutual Insurance Co. v. Commissioner of
Internal Revenue, 523 U.S. 382, 389 (1998).

        In this case, for the reasons discussed above, it was
permissible for the Secretary to construe the statute to permit
designation of covered OPD services after January 1, 1999 and to
permit calculation of payments under the PPS on a prospective
basis.  Because the Secretary's interpretation of the ambiguous
statute was permissible, her interpretation is entitled to
deference under Chevron.

II.  Review of Agency Decision

        Plaintiff also argues that the Secretary's decision not to
calculate PPS payments for subsequently-designated covered OPD
services retroactive to January 1, 1999 was arbitrary and
capricious.  Courts review agency determinations in order to
ascertain whether the agency has "'examined the relevant data and
articulated a satisfactory explanation for its action.'"  See
Novicki v. Cook, 946 F.2d 938, 941 (D.C. Cir. 1991) (citing Motor
Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S.
29, 43 (1983)).  A court should engage in a searching and careful
review of agency action but should not attempt to substitute its

- 9 -

own judgment for the judgment of the agency.  See <u>Citizens to</u>
<u>Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

The Secretary decided that the regulations designating
covered OPD services under the PPS should be implemented
prospectively rather than retroactively to January 1, 1999.  The
Secretary determined that many hospitals had not used the new
coding system when they submitted their claims for outpatient
services between January 1, 1999 and August 1, 2000 -- the
effective date of the regulations.  Because there were millions
of claims for outpatient services during this period of time, the
Secretary reasonably concluded that it would be impracticable to
obtain the necessary information and process it by hand because
of inadequate staffing.  Moreover, devoting limited resources to
calculating retroactive payments would compromise the efficient
implementation of the PPS for prospective payments.

Because the Secretary permissibly interpreted the statute as
not requiring retroactive PPS payments for OPD services furnished
between January 1, 1999 and August 1, 2000, and because making
payments retroactively was determined to be impracticable, the
Secretary reasonably concluded that the regulations designating
covered OPD services should be implemented prospectively.  The
Secretary's decision is neither arbitrary nor capricious, and
defendant is entitled to summary judgment.

- 10 -

CONCLUSION

The Secretary of Health and Human Services reasonably interpreted § 1833(t) of the Social Security Act as not imposing a deadline for regulations designating covered OPD services and as not requiring retroactive payments for services furnished between January 1, 1999 and August 1, 2000.  The Secretary's decision to make the regulations effective on August 1, 2000, rather than retroactive to January 1, 1999, was not arbitrary and capricious.  As a result, defendant is entitled to summary judgment on plaintiff's complaint.  A final order accompanies this Memorandum and Opinion.

SIGNED this _____31st_____ day of _____July_____, 2002.

_____
RICHARD W. ROBERTS
United States District Judge